Good morning. May I reserve three of my 15 minutes for rebuttal? Yes. Thank you, sir. The appellant, Pablo Casellas, contends that his Sixth Amendment right to an impartial jury was violated both because there was at least nine sitting members of the actual jury that knew of, had actual knowledge that he had been tried, convicted, and sentenced of a murder of his spouse, which was a related... Is your main argument, Mr. Weinberg, actual prejudice? Is that your primary argument? There are two. Or is it presumed prejudice? Which are you relying on more heavily? Both. And I think there's an interrelation because to the extent that the court finds that we have satisfied the presumed prejudice pretrial standard, that could result and should result in a changing of the burden of proof. Rather than having to prove that Judge Goodwin abused his discretion in accepting the statement of a potential juror that they could be fair, the burden should be placed on the government to rebut the presumption of prejudice, particularly in the context of a jury selection where 60 of the Vennari people were disqualified for cause and many knew of the cause... So you recognize that the presumption, if it arises, is a rebuttable presumption, right? I would contend it's irrebuttable, but I also concede that cases, including the recent IAF dissent by Judge Torea, presumed that the presumption can be rebutted and overcome by a demonstration of a fair jury selection. It's an unresolved area of law. I would not concede that it should not be irrebuttable because I do believe that when there is this kind of pervasive, saturated, and toxic pretrial publicity, it is very difficult for a judge to fathom whether they can accept a vowel of impartiality, particularly in this context where we're dealing with a conviction of a murder that occurred just months before and that is linked to the success of federal prosecution, which is what makes this case so distinct. Speak, if you would, about that last point about the link because, of course, your opponents make a whole lot out of saying that, yeah, that was the state murder case, that was before, this is the federal case. There had been very little coverage about that and it was mostly factual and jurors can make a distinction. Why don't you take that on head on? Sure. Well, first of all, during Vardir, if we're going to address Vardir, 48 of the jurors, according to the government brief in 14, knew of the carjacking allegations. But even more important is they're inextricably intertwined because the government theory set forth in its notice of intent to use evidence that was filed pretrial stated, point blank, that the reason for the lies, the motive for the staged carjacking, so to speak, was to set up a defense to a planned murder. The goal, in other words, why is the defendant allegedly creating a carjacking? It's to put the murder weapon in the hands of the carjackers. Reinforced by the evidence. The evidence at the federal trial matched the evidence at the state trial and matched the evidence that was in headlines in the state pretrial with pretrial publicity being generated through the state trial. The opening here at the government talked about the seizure of guns on July 14, which was the date of the murder of the spouse, from the residence of Mr. Casais, and that the guns, according to the government, were the very guns Casais claimed was stolen at the carjacking or the guns used to file... And they said that, are you saying they said that in their opening? Yes, sir. That the very guns were the guns stolen from the carjacking? Yes, Your Honor. In the opening, the government stated that the guns which Casais reported stolen during the carjacking, meaning his guns that he claimed carjackers took, one of which he stipulated was at his home on July 14, and that was the gun of 57 that was used in the murder. The murder was excluded as too prejudicial for the jury to hear. The second grouping of guns were guns taken from Mr. Casais' home... That's my point. That's the important point here. The prosecutor didn't say these were the guns that were used in the murder because the judge had ruled that out of bounds, right? Exactly. So, well, how is it that you think that the jury put all this together, the judge saying, don't say anything about it? Well, first, if I can just quote Judge Goodwin, who during voir dire at Appendix 667, when asking about whether there should be a change of venue, said, no one here can say with certainty they won't be heavily influenced by the knowledge of wrongdoing. When they, and this is a quote, when they make the evidentiary connection between the two cases, and why not go somewhere else where no one's ever heard of this fellow? The reason specifically why there's this interlock between the two cases is that the government in the federal case called Agent Diaz to testify to the statements of Mr. Casais. He was a state murder trial witness. They introduced evidence from the car of the projectiles and the trajectory and claimed that those weapons, which Mr. Casais said were fired into the car and forced him to move from the driver's seat to the passenger seat, were found in his own car, meaning inconsistent with the carjacking at a search conducted by the state prosecutor on the day of the murder. So you had every potential for a juror to connect up the carjacking with the weapons. That requires the jurors to know the specific date and to know it was the date of the murder and then to make that evidentiary connection, right? I guess the question I'm trying to get at is the government's position seems to be these are two separate things and we weren't even allowed to talk about the murder and there was not a whole bunch of publicity about this federal case. You're saying they couldn't have escaped it and I'm trying to press a little bit to find out what you've got in the record that leads you to say that the jury had surely, it should be presumed that the jury surely would have made this link. Well, first, the 48 jurors, the government agrees, knew of the carjacking. Why was the carjacking on the front page of the headlines and part of the state murder trial? Because it was the premeditation evidence offered to a state jury just months before. This is not like Skilling where there's a four-year delay. We're talking about two months between the sentencing by a judge for a murder trial that had completed just weeks earlier and the start of the successive federal trial. The carjacking, the reason to lie, the placing of the guns in Mr. Casais' home on the day they searched the home. Why are they searching the home? Every juror knew the search of the home was related to the murder allegations, the murder prosecution. Counsel, before your time's gone, can I ask you, and I know this is gross and a gross question, but I have to ask you, my clerks made a chart of all the cases they could find. And, of course, the stunning thing about the chart is apparently no reversals on this ground since Rideau and Irvin in 1963 and 1961. And I know it's gross, but would you address it? Yes. Rideau is the primary reversal. And what I would contend, Your Honor, is that this case is different for several reasons. One is we don't just have pretrial publicity of a trial that is about to occur. That was the state jury selection. We have pretrial publicity that includes nine jurors who had actual knowledge that Mr. Casais had been tried, convicted, and sentenced for this related murder two months before, not two years before. Again, distinguishing this from many of the precedents before you. This is not even the most recent case by this circuit where in a two-to-one decision on a Mandamus petition, a very extraordinary relief, the circuit refused to interrupt the selection of a jury in the Boston Marathon case. This would be as if they were trying to pick another jury on a second case for Mr. Sonaeth. The first case is over. That's parallel to the state murder trial, the Boston Marathon case. Granted, there was huge toxic publicity. But in Sonaeth, first of all, you had the Mandamus procedure, which was the same. But second of all, there was not knowledge that he had been convicted of a case by another jury that related to the successive case. It would be as if we were on appeal after the selection of hypothetically lying to the ATF about getting a bond part that was started two months after the Boston Marathon trial. So my answer to this wave of adverse precedent that clearly exists, I mean, we have the Ervin case. It, too, could be distinguishable. That was a reversal. Many of the jurors knew about confessions and knew about bad publicity. So it's not unique, Rideau. Rideau even talks, or the Skilling talks, about a confession or, quote, other blatantly prejudicial publicity, setting up a standard that doesn't limit changes of venue, presumptions of prejudice, actual bias to knowledge of a confession. I would contend here that a sitting juror, an average juror, knowing of the conviction of murder, simply can't compartmentalize. So what would you say is the one sentence test for when the prejudice is to be presented? I would say that the test ought to be when an appellate judge questions, is skeptical that an average juror could follow an instruction to exclude consideration of the actual knowledge that another jury two months earlier had convicted this man for murder. Remembering Judge Goodwin excluded the evidence of the murder, relevant evidence, to why Mr. Casillas is lying, finding, A, it's too prejudicial, and, B, it is the risk the jury would be overwhelmed by knowledge of murder if it was admitted in evidence. And yet nine jurors told Judge Goodwin during voir dire, we know that Mr. Casillas was convicted. The publicity here was not just information about a murder allegation. It was information about a nationally televised sentence. It was information that led to celebrations at a sports stadium, and Judge Goodwin wrote about it. This was as toxic, the community was as prejudiced, and an average juror would just have an impossible job compartmentalizing off and ignoring the knowledge of the murder in the context of related evidence. And we've not left you time to talk about the Fourth Amendment, but you're not abandoning your other... Not abandoning it, but I've got to select the issue. Thank you, sir. Thank you. From Appellee, Ms. Heller. Thank you, Your Honor. Kirby Heller for the government. The jury that convicted the defendant in this case was fair and impartial. The district court was well aware of the publicity surrounding the other case, and he structured the proceedings to pick a jury with that in mind. Is there a presumption of prejudice which is such that it can't be overcome? In other words, the test seems to be, and skilling seems to reinforce this, Ms. Heller, that it's not just actual prejudice that matters. There are some times where things are just so toxic that you just presume there's prejudice and that's the end of the matter. Is that a correct understanding of the law? Well, Your Honor, I interpret it slightly differently. To the extent that you're saying that you don't look at voir dire to consider whether there is this presumption of prejudice, I think, except for Rodeau, there really isn't support for that anymore. How about skilling itself, which begins with a presumption of prejudice analysis? If voir dire could cure it and that were okay, that would be an actual prejudice analysis and you'd be done, and that's the alito position. But he was the concurrence. He wasn't the majority. The majority said you've got to look at a presumption. Is that not accurate? That is accurate, Your Honor. The majority did not say we will no longer ever consider a presumption, but it did, of course, look at the voir dire to consider whether a presumption to apply it. The other thing the court did... That's First Circuit law, too, right? Excuse me? That's First Circuit law, too, right? That is First Circuit law, although, again, First Circuit has never even applied the presumption. Whether they've done it or not, analytically, I'm trying to understand what we're supposed to do, and analytically, Skilling looks at the presumption first, and Aguilo, and a whole series of others, Rodriguez-Cardona, Keyless-Olivo, these First Circuit cases, they seem to take an approach that first asks the question, should prejudice be presumed? So isn't that what we have to do here, too? Certainly, Your Honor. That is the established First Circuit law, and Skilling did that analysis as well. So, yes, certainly this court can follow that path, and what that means, if this court were even to find that the presumption was raised, would then look at whether the government had rebutted it by showing that, in fact, the jury that was selected was, in fact, fair and impartial. So, query, just as a matter of logic, can, if the presumption can be rebutted by statements of jurors, that, oh, I can be fair and impartial, I just saw a videotape of the crime before I walked in here, but I can set that aside, and the judge says, okay, what's left of the presumption? Well, it would be our position that not very much is left of the presumption, that so long as the government demonstrates. So it's all lip service? Well, I think what happened in terms of certainly the First Circuit law,  and then we have the two cases that talk about whether the trial atmosphere was, in fact, corrupted, and those are all presumption. The court has used that term presumption very loosely, and so it's continued to really pay lip service to it, but it doesn't really serve to do much except, perhaps, to change the allocation of the burden of proof. The government here did not oppose the change of venue motion, and I'm wondering why, and the government acknowledged that it was massive and sensational. That's the language that the government agreed to, massive and sensational pretrial publicity for the murder case. Under those circumstances, and that this carjacking was part and parcel of the setup for the murder, I mean, that's factually inescapable. Why? What was the government's reason for urging the district court to keep the case there? Having said they didn't oppose it, the Assistant U.S. Attorney, Mr. Gil Farb, if I'm saying his name right, kept urging the court, no, talk to some more jurors, seated jury, seated jury. What's the logic there? Well, I only know what's in the record, and it appears that the reason that the government didn't oppose the change of venue was because it acknowledged there was this massive publicity, and we're not stepping back from that position. But then he also said, this doesn't mean that the judge independently wasn't going to fulfill its obligation to find out whether, could it actually pick a jury? Because that is the test, could you pick a fair jury? And at some point, I think the government, the prosecutor, candidly admitted that it would have been easier. It would have been easier to move it, but that's not the test. Sure it would have, and so here's the question I've got. Even as a matter of mootness, we're talking about a 21-month concurrent sentence on top of a 109-year murder conviction. Can you explain what practical ramification there is to our deciding this case one way or another? Is there some effect on parole eligibility? Why are we here? Why are we talking about this? Well, Your Honor, again, I can only say what I know from the record, and the only even suggestion in the record, and I have to say the district court was somewhat offended by it, was there was some concern about what would happen in the local courts, whether, in fact, this conviction would stand. And that's really all I know. Has it been appealed and decided now? I'm sorry, Your Honor? Has it been appealed and decided now? It hasn't been decided on appeal. The appeal is pending. The appeal is pending, okay. While we're asking if things can be explained by the record, how long did they have this car before they searched it? Oh, let me think about the dates. The carjacking, I believe, the alleged carjacking was Father's Day, so I think it was around June 13th, and they searched it about a month later. Why? Does the record reveal why did they wait a month to search the car? They had it by consensual search. Consent could be withdrawn, whether the request for the car back comes to withdrawal or not is a different question. They knew consent could be withdrawn. Why did they not search the car the day they got it? Well, I think one agent got the consent, and before they could do this more intrusive search, he had to put in a written request, which he didn't do right away. I don't know if he didn't understand he had to do it or he didn't, but he didn't put his written request in right away. Written request to whom? To the person in charge of this more intrusive search, basically looking beyond the dashboard and wherever they looked for his other evidence. Once that written request was put in, it was scheduled right away. It didn't happen right away, but it was scheduled, but the record indicates that this agent who was in charge of this kind of search had other matters that had already been scheduled and took precedence, and so that explained the timing. You know, I've prosecuted a few years and was a trial defense attorney and a trial judge. I never heard of the federal authorities having a consent to search a vehicle or other tangible movable property and waiting more than a day. Is this happening now as routine things in Puerto Rico, or is this? I don't know the answer to that, Your Honor. I don't know if things are different there. Let me ask you then, when the defendant asked for his car back and they didn't give it to him, is that consistent with a consent search, or is there a good Fourth Amendment claim here? Well, we don't believe that there is, Your Honor. I don't care what you believe. Tell me what the law is. And I will tell you why we don't believe that. The question is whether there was an unequivocal withdrawal of consent. Certainly he can withdraw his consent. We're not debating that. And what happened is he called a couple of days after the alleged carjacking. The defendant called the FBI and said, you know, I want to have my insurance person look at the car. Have you done the search yet? He didn't say, can I have my car back? Have you done the search yet? And the agent said, no, we haven't. You know, your inspectors can come here if they want to look at it. Call again in a week. And then the agent testified at the suppression hearing that that same pattern was repeated several more times. So the fact that he called several times was at the agent's suggestion. And he didn't say, the defendant did not say, forget it. You know, don't do the search. I want my car. He said, have you done the search yet? Which the district court concluded was not a withdrawal of consent. And, of course, that is reviewed for clear error. All right, okay. Yeah, I've got some more questions if you don't have something you want to ask. If you want to say, all right, let's talk about how the analysis of presumed prejudice is actually supposed to proceed. Setting aside the assertion, the colleagues you have there on the other side of the courtroom are saying that the government position is there is no such thing left as the presumption. But I understand you'd be saying you acknowledge there is a presumption rule still, right? Correct. Okay. So how does that analysis, how is it supposed to proceed? It appears that there is a disjunctive test stated in the First Circuit that either, and this is from Rodriguez Cardona, either inflammatory publicity about a case has so saturated a community that it is almost impossible to draw an impartial jury, or so many jurors admit to disqualifying that the trial court may legitimately doubt the disavowals about being partial. So if I've understood that correct, it's an either or test, and so you can establish prejudice simply on the basis of inflammatory publicity so saturating the community that a judicial determination could be made that it's practically impossible to draw a jury. Is that a correct understanding of that? Well, I believe the First Circuit has said that in parts. It's hard to see them as really disjunctive. It seems to me they have to be related. But if you look at the Supreme Court, certainly it has said in no uncertain terms, and I think the best articulation of this is in the Daubert case, which is the quantum of pretrial publicity by itself is not enough. Extensive publicity is not enough. No, no, no. But publicity that's sensational and corrupting to the fairness of the people. I mean, the Supreme Court, far from saying the volume is irrelevant, seems to say it's relevant, and if it's of a certain character, that's key, right? That's correct. So for that prong of the test, I think you'd want to look at whether it corrupted, and that's language from the Supreme Court, the trial proceeding. So, again, we would look at whether you would look, I think, at the jurors' responses to get a sense of whether it has corrupted. So you're saying it's not a disjunctive test. The First Circuit has said repeatedly, repeatedly has framed it disjunctively, but you're saying it can't be applied that way. Am I understanding you? Well, I think they're related, so I don't think you can look solely at the nature of the pretrial publicity. Yeah, so it's not disjunctive, right? If it's disjunctive, it's either or. You don't look at both. You'll look at one or the other, and it's sufficient. But you're saying logically that's true, but in practice the First Circuit doesn't follow that. Is that what you're telling me? Yes, Your Honor. Okay. Can I ask a very simple point? I thought 10 of 11 on the jury knew of the murder conviction. I heard the other side say 10 of 12 knew of the murder conviction. I heard them say 9 of 12. What do you think the number is? I believe it is 10, Your Honor. I had that in my notes, but I am interested. So you think it is 10 of 12? Right. But the important point in our view is that, again, and this is I think the assumption that underlies the defendant's argument that's not accurate is that knowledge by itself is enough, and both the First Circuit and the Supreme Court has repeatedly said that knowledge is not enough. What is a disqualifying opinion is the fixedness of the opinion. I don't see how you can consider that in determining whether the presumption applies. That might seem to be irrelevant to whether it gets rebutted, but you're normally I would think going to be making the determination of whether the presumption applies before you get to the point of questioning whether there is a fixedness to the preformed opinion. Right. And, Your Honor, I think both the First Circuit and the Supreme Court has gone away from just looking, again, at this publicity. They've looked at the answers of the veneer, and they've looked at the answers of the actual jurors that are selected. And if I could just finish that thought. In this particular jury, although they knew, most of them knew about the state proceedings, and there was massive amounts of publicity, they all entered that jury box saying, I don't have an opinion. Not only is it not fixed, I don't have an opinion about the defendant's guilt, and whatever I know I can put aside. It's hard to imagine that there could be a constitutional violation under those circumstances. Counsel, let me see. Any judges have questions? No. Okay. Thank you for your argument. I will address where Ms. Heller left off, which is the Angiulo case, the Circuit's decision, U.S. v. Angiulo, that was incorporated into the majority opinion in the Zaniyaf-Mandamus opinion, says, quote, where a high percentage of the venari admits to a disqualifying prejudice, a court may properly question the remaining jurors of vowels of impartiality and choose to presume prejudice. Given the judge's exclusion of relevant evidence, murder, I would contend that knowledge of a conviction by another jury of murder is just the kind of disqualifying prejudice that a huge percentage of the jury venari admitted to. Okay. Assume that's true, and you get the presumption, and assume for the sake of discussion that we don't agree with you that it's speak to the final point that Ms. Heller made, which is the jury that was seated here was carefully vetted, and every one of them said, I can be fair, I can set aside what I know, I can listen and hear impartially, and the judge who was there on the scene said, I believe him. Given the standard of review that binds us, why would that not be sufficient to rebut the presumption? Because the nine of the jurors, despite their avowal of impartiality, said to Judge Goodwin, I know of the murder conviction, and I know of the murder sentence, and the murder was relevant to the carjacking. So you're fighting a hypothetical. I said presume for the sake of discussion that it's a rebuttable presumption. What it sounds like you're saying is it's not rebuttable. There's no level of assurance that any juror could give here that would rebut the presumption in your view. No, respectfully, I think that you could have a presumption of prejudice, and if this court elects to find that that's not an irrebuttable presumption that must be addressed pre-trial through a change of venue, we proceed to voir dire. At voir dire, and I contend this voir dire reinforced the presumption, but you could in a venari of 1,000 people have 12 jurors that said to the judge, I never heard of the conviction. I didn't watch the sentence. So it's only to have rebutted it, in your view, they would have to have no knowledge. How do you respond to the Supreme Court decisions like Murphy and others that say it's not enough? I mean, it's not dispositive to say I've got knowledge. Just the way it's also not dispositive for a juror to disavow a partiality, it's not sufficient to say I've got knowledge. Mere knowledge is not going to get you where you need to get. Because in Murphy and other cases, the knowledge was of a random prior conviction, although in Murphy it was a burglary and a murder, it didn't correlate and inextricably intertwine to the facts of the case. A small percentage of the venari in Murphy were challenged for cause. Here there was a significant percentage challenged for cause. And in Murphy, there was not this toxic community, celebratory, pervasive, prejudicial atmosphere. Murphy was almost a folk hero in Miami, a guy that could climb hotel facades and enter hotel rooms. So you view this as akin to the confession in Rideau? Yes, and the Supreme Court didn't limit presumption of prejudice to a confession. It talked about other blatantly prejudicial information. What could be more prejudicial than to know that the defendant presumed innocent has just been convicted by another jury and sentenced by another judge to 109 years in a case where the federal prosecution brought for reasons I can't fathom, given the 109-year sentence, was about a lie to set up the acquisition of a gun that was going to be used a month later? Do the judges have questions? Nothing else. Okay. If I could just say one other thing on page 8497, Your Honor, I think it's the answer to the Fourth Amendment issue where the agent testifying in a pretrial hearing said, I advised Mr. Casais during the first phone call, we couldn't return the car because we haven't searched it, which provides the predicate for the next three calls under the 20-day period. Thank you, sir. Thank you, sir. Thank you, everyone.